## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 07 B 00022 |
| | ) | Chapter 7 |
| ERNEST J. OJEDA and | ) | Judge John H. Squires |
| BEVERLY V. OJEDA, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| GAIL GOLDBERG, | ) | |
| | ) | Adversary No. 07 A 00192 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERNEST J. OJEDA and | ) | |
| BEVERLY V. OJEDA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the complaint filed by Gail Goldberg ("Gail")
against Ernest J. Ojeda ("Ernest") and Beverly V. Ojeda ("Beverly") (collectively the
"Ojedas") which seeks to except a debt owed by the Ojedas from discharge pursuant to 11
U.S.C. § 523(a)(2)(A). For the reasons set forth herein, the Court finds that the debt owed
by the Ojedas to Gail is dischargeable. The Court finds that at trial Gail demonstrated by a
preponderance of the evidence that the Ojedas obtained extensions and renewals of the
unpaid debt through false pretenses by omitting to disclose pertinent changes and
developments in their financial condition and the collateral for the debt, but that Gail's
inaction did not meet the justifiable reliance standard required for recovery of her claim
under § 523(a)(2)(A).

-2-

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (O).

## II. FACTS AND BACKGROUND

Many of the facts are not disputed. The Ojedas, restauranteurs, met Gail, a former high school teacher, and her husband, Ronald Goldberg ("Ronald"), an entrepreneur and lender engaged in the wireless phone business, prior to August of 1998 through George Tomaszewicz, a loan broker who was a neighbor of Gail and Ronald. The purpose of the meeting was for the Ojedas to obtain a $600,000 loan from Gail and Ronald. The contemplated loan was to be a short-term bridge loan used to pay off a previous loan owed by Ernest for $600,000 from Richmond Bank. (Gail Ex. U.) Prior to Gail and Ronald agreeing to loan funds to the Ojedas, the Ojedas represented to Gail and Ronald that they were going to provide, as collateral, bank stock in Pan American Bank, which was owned by Pan American Bancshares, Inc., a Delaware corporation ("Bancshares"). Bancshares was the holding company that owned all of the outstanding shares of Pan American Bank, an Illinois banking corporation.

Ernest represented that he was the chairman of the boards of directors of Pan American Bank and Bancshares. The Ojedas provided Ronald and Gail with a personal financial statement, dated April 3, 1998, which stated that Ernest owned 160,000 shares of

-3-

Pan American Bank stock with a value of $800,000. (Gail Ex. F.) The financial statement

stated in pertinent part as follows:

> Each undersigned understands that you are relying on the
> information provided herein (including the designation made
> as to ownership of property) in deciding to grant or continue
> credit. Each undersigned represents and warrants that the
> information provided is true and complete and that *you may
> consider this statement as continuing to be true and correct
> until a written notice of a change is given to you by the
> undersigned.* You are authorized to make all inquiries you
> deem necessary to verify the accuracy of the statements made
> herein. . . .

(*Id.*) (emphasis supplied).

The Ojedas also informed Gail and Ronald that they were the sole shareholders of

two Illinois corporations, Dices, Inc.[1] and Pelham Enterprises, Incorporated ("Pelham").

Pelham owned franchise rights, a real estate lease, and related personal property with respect

to a McDonald's restaurant located at 1951 North Western Avenue, Chicago, Illinois. The

Ojedas, doing business as Dices Enterprises,[2] owned franchise rights, a real estate lease, and

related personal property with respect to a McDonald's restaurant located at 405 North

Wabash Avenue, Chicago, Illinois. Ernest and Beverly were actively involved in the

management and operations of both restaurant facilities. The Ojedas provided Gail and

Ronald with financial statements for Pelham and Dices Enterprises. (Gail Exs. H & I.)

Further, the Ojedas provided Gail and Ronald with their income tax return for 1997 (Gail Ex.

---

[1] Dices, Inc. operated as a management company and did not own any substantial
assets.

[2] The Ojedas operated Dices Enterprises as a proprietorship.

-4-

J), press releases and articles describing Pan American Bank and Ernest's role there (Gail Ex. G), and draft financial statements for Pan American Bank. (Gail Ex. O.)

On August 6, 1998, Gail and Ronald loaned $600,000 to the Ojedas at an annual interest rate of 18%. (Gail Ex. A.) The loan was intended to be short-term and was evidenced by a secured promissory note (the "1998 Note") dated August 6, 1998. (*Id.*) The terms of the 1998 Note required a payment of accrued interest on September 6, 1998, and on the maturity date of October 6, 1998, the principal amount and any accrued unpaid interest remaining was to be repaid. (*Id.*) Pursuant to the 1998 Note, the loan was secured by 160,000 shares of "Pan American Bank" stock.[3] (*Id.*)

In addition, on August 6, 1998, Ernest, individually and as chairman of the board of Pan American Bank, executed and delivered to Ronald and Gail a hypothecation agreement that described the "Pan American Bank" stock being pledged as security for the 1998 Note. (Gail Ex. C.) At the time the 1998 Note and hypothecation agreement were tendered to Ronald and Gail, Ernest also tendered possession of an original stock certificate No. CS-001

---

[3] Ernest did not own 160,000 shares of Pan American Bank's stock at that time or any time. Rather, Ernest owned 160,000 shares of Bancshares (Gail Ex. N), the holding company whose sole asset was 100% of the shares of Pan American Bank's stock. As a result, in 1999, Ernest, individually and as chairman of Bancshares, executed and delivered to Ronald and Gail a second hypothecation agreement pledging 160,000 shares of common stock of Bancshares as security for the 1998 Note. (Gail Ex. D.) Ernest testified at trial that in his mind Pan American Bank and its holding company, Bancshares, were one in the same. Although they were separate corporate entities, Gail is not raising any issue regarding this failure to distinguish between Pan American Bank and Bancshares either in the original loan documents or the subsequent documents with respect to the extensions.

-5-

registered in his name reflecting the issuance of 160,000 shares of Bancshares stock to Ernest. (Gail Ex. N.) Ronald and Gail retained possession of the stock certificate at all relevant times and continue to retain possession of the certificate.

At some unknown point in time, the Ojedas also executed an undated UCC-1 financing statement that described the collateral as 160,000 shares of "Pan American Bancshares." (Ojeda Ex. No. 4.) Ronald and Gail did not file the UCC-1 financing statement with the Illinois Secretary of State, nor did they file notice of either the stock power or the hypothecation agreement with the Bancshares stock registrar or transfer agent.

After entering into the loan agreement, the Ojedas began making monthly interest payments to Ronald and Gail. The Ojedas were unsuccessful in their efforts to secure a conventional take-out lender. The Ojedas did not repay the principal of the 1998 Note on its October 6, 1998 maturity date. Rather, the Ojedas continued to make monthly interest payments, and Ronald and Gail continued to accept those payments. Subsequently, some time after the 1998 Note matured, the Ojedas executed an undated note payable to both Ronald and Gail, which replaced the 1998 Note and extended the maturity date of the loan until December 1, 2000 (the "Second Note"). (Ojeda Ex. No. 2.) The Second Note continued the pledge and grant of the security interest to Ronald and Gail in the 160,000 shares of Bancshares stock. (*Id.*) Thereafter, Gail and Ronald sent monthly invoices to the Ojedas for interest due on the loan. Pursuant to the Second Note, the Ojedas made all of the monthly interest payments to Gail and Ronald.

During 1998, Pan American Bank was experiencing financial difficulties and was unable to raise additional capital as demanded by the Bank's regulators. As a result, some

-6-

time in 1998 or the first half of 1999, Bancshares, in response to Pan American Bank's

regulators, began to look for a purchaser for the Bank. This fact was not disclosed to Ronald

and Gail.[4] Unbeknownst to Ronald and Gail, on October 5, 1999, Bancshares entered into

a purchase agreement with JD Financial Group, Inc. ("JD Financial") pursuant to which

Bancshares agreed to sell all of its interest in Pan American Bank to JD Financial for

$800,000. (Gail Ex. P.) In a second addendum to that purchase agreement, dated October

31, 1999, the purchase price was amended to $250,000, plus 4,000 shares of common stock

of JD Financial, which subsequently became the new holding company for Pan American

Bank. (*Id.*) After the sale was closed, Bancshares changed its name to Cermak Road

Holdings, Inc. ("Cermak").

Incidental to the sale, but without the knowledge of Ronald and Gail, Ernest, as

chairman of the board of Bancshares, sent a letter dated November 17, 1999 to the

shareholders of Bancshares. (*Id.*) In the letter, Ernest informed the shareholders that

Bancshares had sold all of the stock of Pan American Bank to JD Financial, had effectuated

a one-for-one hundred share reverse stock split of the common stock of Bancshares, and that

the total number of common shares of stock had been reduced to 15,000. (*Id.*) Additionally,

Ernest stated in the letter that no new certificates representing the reduced number of shares

_____

[4]  The testimony on this point was in conflict. Both Ronald and Gail testified that
they were unaware of the Pan American Bank sale until after January 2006, when the Ojedas
stopped paying interest on the loan. Ernest, on the other hand, testified that he informed
Ronald of the sale of Pan American Bank at or around the time of the sale. Ernest's trial
testimony, however, was contradicted by his deposition testimony wherein he stated that he
did not remember if he told Ronald and Gail about Pan American Bank's financial problems
and ultimate sale. Because of this conflict in Ernest's testimony, the Court affords more
weight and credence to the testimony of Ronald and Gail.

-7-

would be distributed. (*Id.*) As a result of the decision not to issue new certificates, the stock certificate in the possession of Ronald and Gail was never retrieved or exchanged for shares in Cermak. Only the preferred shareholders of Bancshares received funds from the sale of Pan American Bank; Ernest did not receive any monies.

The Ojedas knew at that time that Ernest's interest in Bancshares, which had been valued at $800,000 in the personal financial statement submitted to Gail and Ronald in April of 1998, was not worth that amount in November 1999 when the sale of Pan American Bank to JD Financial was consummated. Ernest admitted that he never told Ronald or Gail of the reverse stock split for Bancshares or its name change to Cermak. Moreover, he testified that he never advised Ronald and Gail to exchange the Bancshares pledged stock certificate for one from Cermak.

Around the time of the Pan American Bank sale, Ernest was communicating with Ronald. On December 28, 1999, Ronald wrote Ernest a letter expressing concern over the financial condition of Pan American Bank, his desire to obtain additional collateral to secure the loan, and the fact and substance of his prior conversation with Ernest. (Ojeda Ex. No. 3.) In this letter, Ronald confirmed that the "note was extended to January 6th of 2000." (*Id.*) Ronald also acknowledged that he had knowledge of Pan American Bank's financial problems several months prior to the sale. Specifically, Ronald wrote: "[s]everal months ago . . . with the concerns of [Pan American Bank's] operational condition, my legal staff reviewed the loan documents and extensions." (*Id.*) Further, Ronald confirmed a conversation with Ernest regarding additional support for the loan. He stated: "[n]ot mentioned in the documents however discussed with you would be an additional pledge and

-8-

or guarantee of the McDonald['s] Stores as the *[Pan American] [B]ank operations and value
are questionable*." (*Id.*) (emphasis supplied).

Ronald testified that from the beginning of the loan, he was impressed by the fact that
the Ojedas, through Pelham and Dices Enterprises, owned and operated the McDonald's
restaurants. Ronald testified that he learned from a friend who worked at the McDonald's
corporate office that the two restaurants were excellent producing locations. Ronald stated
that he thought that adding corporate guarantees from Pelham and Dices Enterprises would
provide necessary additional security to the 160,000 shares of Bancshares stock that the
Ojedas had previously pledged.

In an undated letter that was postmarked March 6, 2000, Ronald wrote to his
attorneys advising them of his belief that the value of the Bancshares stock was inadequate
to secure the Ojedas' loan, and suggesting that they negotiate to obtain additional guarantees
and security in connection with the negotiation of an extension of the maturity date of the
loan. (Ojeda Ex. No. 4.) Ronald wrote in the letter: "[a]s we discussed we consider the stock
from |Bancshares| not worth the collateral value. |Ernest| has agreed to issue a corporate
guarantee from his McDonald|'s| Stores. I would further suggest if you think the guarantee
is not strong or protective enough that you ask for a pledge or something of his stock in the
stores." (*Id.*)

The negotiations between the Ojedas and Gail and Ronald relating to the extension
of the Second Note continued for approximately eighteen months. On November 1, 2001,
Gail and the Ojedas finalized and executed another written extension in the form of a new

-9-

secured promissory note (the "2001 Note") for the principal amount of $600,000.[5] (Gail Ex. B.) Both Dices, Inc. and Pelham executed the 2001 Note as guarantors. (*Id.*) On November 29, 2001, Pelham and Dices, Inc.[6] executed separate corporate guarantee agreements. (Gail Ex. E.) Pursuant to the terms of the 2001 Note, the eighteen percent interest was payable monthly, and a final payment of interest and principal was payable on the maturity date of January 2, 2003. (Gail Ex. B.) The 2001 Note was secured by the pledge of 160,000 shares of Bancshares stock[7] which was allegedly memorialized in a certain hypothecation agreement.[8] (*Id.*) At the time the Ojedas executed the 2001 Note, Ernest did not own 160,000 shares of Bancshares stock. He never advised Ronald or Gail that Bancshares was now Cermak and those shares were worthless after the Pan American Bank sale. Nothing in the 2001 Note or the guarantees restricted the Ojedas or the two corporate guarantors- Pelham and Dices, Inc.–from selling or otherwise disposing of any of their assets, with the exception of the Bancshares stock.

---

[5] At this point in time, Gail became the sole lender and payee of the 2001 Note from the Ojedas. Ronald and Gail testified that this was done for estate planning purposes.

[6] As set forth in footnote one, Dices, Inc. did not own any substantial assets. Rather, Dices Enterprises was the proprietorship, operated by the Ojedas, that owned and operated the McDonald's restaurant located on Wabash Avenue in Chicago. Nevertheless, Dices, Inc. executed the 2001 Note as guarantor and executed a corporate guarantee.

[7] The 2001 Note referenced 160,000 shares of Pan American Bank stock. As discussed previously in footnote two, however, Ernest owned 160,000 shares of Bancshares, not Pan American Bank stock.

[8] There is no evidence that any such new hypothecation agreement was executed in connection with the 2001 Note.

-10-

No further written agreements were entered into between the Ojedas and Ronald and Gail with respect to the $600,000 loan after the 2001 Note. On January 2, 2003, the maturity date of the 2001 Note, the Ojedas did not pay the principal amount of the loan. However, they continued to make prompt monthly interest payments to Gail and she continued to accept such payments. Gail elected not to demand repayment of the loan and she did not pursue immediate collection of the unpaid outstanding principal indebtedness.

In 2004, the Ojedas began to explore the sale of the McDonald's restaurants. The Ojedas testified that they considered a sale because ongoing changes in the corporate structure made the restaurants less attractive as investments. The Ojedas had a significant deferred tax gain, however, that could be realized if they sold the restaurants. Thus, the Ojedas testified that they began to look for a new "like-kind" business in which to invest the proceeds of the sale and avoid recognition of the tax gain on the sale. On October 1, 2004, Pelham and Dices Enterprises sold their interests in the two McDonald's restaurants and franchises for a total purchase price of approximately $5,100,000. (Ojeda Ex. No. 43.) The proceeds of the sale were used to pay outstanding claims of the restaurants' creditors and the Ojedas. (*Id.*) The approximate $2,300,000 balance of the sale proceeds was deposited into a "Starker trust" pending investment in like-kind assets to be qualified under I.R.C. § 1031.[9]

---

[9] Section 1031(a) of the Internal Revenue Code, in general, permits property used in a trade or business or held for investment to be exchanged solely for like-kind property which will be used in a trade or business or held for investment, without the recognition of tax. A deferred exchange allows the taxpayer to relinquish property currently held and receive like-kind replacement property in the future. The case *Starker v. United States*, 602 F.2d 1341 (9th Cir. 1979), gave rise to the deferred exchange. In 1984, Congress enacted § 1031(a)(3), which permits deferred exchanges within a specific time limitation. Placement of property into a Starker trust allows a seller to complete a non-simultaneous property exchange and postpone recognition of capital gain taxes.

-11-

The Ojedas testified that the instant loan was not repaid to Gail because on the advice of their

attorneys and accountants, payment of the loan would have triggered recognition of serious

tax consequences and recognition of capital gain.

During the same time they negotiated the sale of the McDonald's restaurants, the

Ojedas negotiated to purchase Joey Buona's Pizzeria Grille ("Joey Buona's") located at 160-

164 East Superior Street, Chicago, Illinois. On December 31, 2004, Pelham entered into an

asset purchase agreement with Joey Buona's Pizzeria Grille-Chicago, L.L.C. wherein Pelham

acquired a restaurant business, including an assignment of a lease and option to purchase

certain real property premises, all personal property located on the premises and used in the

operation of the restaurant, and certain intellectual property rights relating to the "Joey

Buona's System." (Ojeda Ex. No. 46.) Pelham closed the purchase of the Joey Buona's

restaurant in the middle of January of 2005. The remaining proceeds of the sale of the

McDonald's restaurants were invested in the purchase of Joey Buona's. Ernest testified he

told Gail in a short phone conversation about the McDonald's sales and his intent to repay

the loan owed to her. Gail denied that Ernest told her about the sale of the restaurants.

On January 26, 2005, a press release was issued that announced a sale of Joey

Buona's and disclosed the Ojedas as the purchasers of the restaurant. (Ojeda Ex. No. 45.)

The Ojedas did not inform Gail or Ronald of Pelham's purchase of Joey Buona's. The

Ojedas testified that they were on site at the Joey Buona's restaurant almost every day during

the time Pelham owned and operated the restaurant. The Ojedas also testified that they did

not take any action to conceal their ownership of Joey Buona's. Pelham was unsuccessful

-12-

in its operation of the Joey Buona's restaurant. Joey Buona's failed in February of 2006. Thereafter, Pelham filed a voluntary Chapter 7 bankruptcy petition on January 25, 2007.[10]

The Ojedas made all of their regularly scheduled interest payments to Gail without fail until they defaulted in January of 2006. Since the inception of the loan, the Ojedas made approximately eighty-nine monthly payments of interest with an aggregate value of approximately $801,000. The Ojedas never repaid any of the principal on the $600,000 loan. Thus, although the loan between the Ojedas and Ronald and Gail was intended to be a short-term bridge loan, it lasted for almost eight years during which time interest was paid as agreed.

Since 1998, the Ojedas made the majority of their interest payments to Gail with Pelham or Dices Enterprises checks. (*See, e.g.,* Gail Exs. K & L.) The Pelham and Dices Enterprises check stock included the McDonald's name, store numbers, store addresses, and a reference to "general account." (*Id.*) After March 2001, the check stock also contained the McDonald's logo. After the sale of the McDonald's restaurants in October of 2004, and the subsequent purchase of Joey Buona's, the Ojedas wrote checks to Gail only on Dices Enterprises check stock that had the McDonald's name and/or logo, the words "general account," the specific franchise number, and the address of the restaurant that Dices Enterprises operated on Wabash Avenue in Chicago, even though Dices Enterprises no longer owned or operated the restaurant or had any right to continue to represent itself as being affiliated with McDonald's. (*See, e.g.,* Gail Ex. L.)

---

[10]  The Court issued a Memorandum Opinion that sets forth the background and circumstances surrounding the Pelham bankruptcy filing. *In re Pelham Enters., Inc.,* 376 B.R. 684 (Bankr. N.D. Ill. 2007).

-13-

Beverly testified that after the sale of the McDonald's restaurants, an accountant told her to remove the McDonald's logo from the Dices Enterprises checks. Beverly stated that when she ordered new checks, she instructed the bank to remove the logo from the checks, but did not request that the franchise number or store address be removed. Beverly explained that because the Dices Enterprises account number remained the same, she did not think it was necessary to remove the franchise number or the address of the formerly owned McDonald's restaurant.

Beginning in January of 2005, shortly after Pelham sold its McDonald's restaurant, Pelham's corporate checks no longer possessed the McDonald's reference. Instead, those checks began to refer to "Joey Buona's Pizzeria Grille." (Gail Ex. W.) However, after the McDonald's restaurants were sold and Joey Buona's was purchased, Gail was never paid with any checks from Pelham's account. (Gail Ex. L.)

Although Gail glanced at the financial statements and other documents furnished by the Ojedas at the time of the original loan, she did not closely examine those documents. She relied completely on Ronald's advice and recommendations at all times. Gail testified that she was not concerned about the loan given the original and subsequent collateral therefor, and because the Ojedas were making timely monthly interest payments as agreed on the original loan and the extensions until January 2006. It is undisputed that the negotiations for the deal and most of the subsequent communications involved Ronald and Ernest, not Gail or Beverly. There were only a few communications between Gail and Ernest.

-14-

The Ojedas filed a voluntary Chapter 7 bankruptcy petition on January 2, 2007. Thereafter, Gail filed the instant adversary proceeding on March 28, 2007. The Ojedas received a discharge pursuant to 11 U.S.C. § 727(a) on November 2, 2007.

The Court held an evidentiary hearing in this matter. The Ojedas moved for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52 and its bankruptcy analog Federal Rule of Bankruptcy Procedure 7052. Pursuant to Bankruptcy Rule 7052(c), the Court reserved ruling on the motion until the close of all the evidence. Thereafter, the Court took this matter under advisement. The Court denies the Ojedas' motion because the preponderance of all the evidence shows that by omission and silence, the Ojedas failed to disclose their true financial situation regarding the Bancshares stock and the sale of the McDonald's restaurants thereby creating the false pretense that they still owned both the stock and the restaurants and that those assets had value to support the collateral held by Gail for the unpaid loan balance, even though Gail's actions and omissions did not constitute justifiable reliance.

### III. **APPLICABLE STANDARDS**

**A.    Exceptions to the Discharge of a Debt**

The main purpose of a discharge in bankruptcy is to give a debtor a fresh start. *See Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995). The United States Supreme Court

-15-

has held that the burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). *See also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000); *Kolodziej v. Reines (In re Reines)*, 142 F.3d 970, 972-73 (7th Cir. 1998); *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985). "The statute is narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001).

**B.    11 U.S.C. § 523(a)(2)(A)**

Pursuant to the complaint, Gail alleges that the extensions of the loan to the Ojedas, not the original loan itself, were obtained by false pretenses, false representations, and/or actual fraud. Specifically, Gail contends that the Ojedas' failure to inform her of the sale of Pan American Bank and the reverse stock split by which the 160,000 shares of Bancshares stock that had been pledged for the original loan became 1,600 shares of Cermak stock, constituted a fraud. Gail alleges that the Ojedas' actions, conduct, and omissions regarding the status of the 160,000 shares of the Bancshares stock were made with the intent to trick Gail into thinking that the loan remained fully secured with valuable collateral. Further, such actions on the part of the Ojedas enabled them to obtain multiple extensions of the loan from Gail.

In addition, Gail alleges that the sale of the two McDonald's restaurants was never disclosed. According to Gail, the Ojedas actively and repeatedly misrepresented to her for

-16-

two years that they, through Pelham and Dices Enterprises, continued to own these restaurants by making interest payments to Gail using corporate checks that referenced McDonald's. Gail contends that the Ojedas made these false representations to her in order to obtain extensions on the repayment deadline for the $600,000 principal and to prevent Gail from instituting a collection action. Gail states that she relied upon these alleged false representations which were made with fraudulent intent. Gail seeks a determination that the $600,000 principal debt, plus attorney's fees, costs, and unpaid interest should be determined to be non-dischargable under 11 U.S.C. § 523(a)(2)(A).

One issue the Court must address is the amount of the alleged non-dischargeable debt. Gail contends that the debt consists of the original $600,000 principal loan, plus interest (including attorney's fees and costs) from the date the Ojedas stopped paying–January 2006. On this point, however, Gail is mistaken. Section 523(a)(2)(A) excepts from discharge a debt for money or an extension, renewal, or refinancing of credit "*to the extent obtained by* false pretenses, a false representation, or actual fraud. . . ." 11 U.S.C. § 523(a)(2)(A) (emphasis supplied). Thus, non-dischargeability is limited to the portion of the debt directly attributable to false pretenses, a false representation, or fraud. *See Baytree Nat'l Bank & Trust Co. v. Christensen (In re Christensen)*, Bankr. No. 04 B 17486, Adv. No. 04 A 3646, 2005 WL 1941231, at *5 (Bankr. N.D. Ill. Aug. 12, 2005) (*citing FTC v. Austin (In re Austin)*, 138 B.R. 898, 915 (Bankr. N.D. Ill. 1992); *McCullough v. Suter (In re Suter)*, 59 B.R. 944, 946-47 (Bankr. N.D. Ill. 1986)). In the matter at bar, it is undisputed that the Ojedas did not obtain the original $600,000 principal by fraud, false pretenses, or

-17-

false representations. Thus, only the unpaid interest from January of 2006, plus attorney's fees and costs, which were not specified or quantified at trial, are potentially non-dischargeable.

Section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the dischargeability of debts. Section 523(a)(2)(A) provides as follows:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) covers more than just a debtor obtaining money or property by false pretenses, a false representation, or actual fraud. *Freer v. Beetler (In re Beetler)*, 368 B.R. 720, 728 (Bankr. C.D. Ill. 2007). It also encompasses a situation where the debtor obtains an extension, renewal, or refinancing of credit by such wrongful conduct. *Id.* Renewal of a debt may be excepted from discharge even though the creditor did not extend "new money" to the debtor at the time of the renewal. *Bremer Bank, N.A. v. Wyss (In re Wyss)*, 355 B.R. 130, 135 (Bankr. W.D. Wis. 2006).

The Seventh Circuit Court of Appeals has not addressed the issue of whether a fraudulently induced forbearance constitutes an extension or renewal of credit for purposes of § 523(a)(2)(A). *Beetler*, 368 B.R. at 728. Several lower courts within the Seventh Circuit, however, have taken the position that forbearance from enforcing contractual rights

-18-

constitutes an extension or renewal of credit under § 523(a)(2)(A). *Id.* at 728-30 (collecting

cases). Other circuit courts take the position that forbearance can be an extension or renewal

of credit. *Id.* at 730 (collecting cases). The Court agrees with the view that a fraudulently

induced forbearance may constitute an extension or renewal of credit for purposes of §

523(a)(2)(A). "The elements of proof necessary to establish such fraudulently-induced

forbearance include 'discernable harm to the creditor in the sense that it had valuable

collection remedies at the time of the misrepresentation, that it did not exercise those

remedies based upon the misrepresentation, and that the remedies lost value during the

extension period.'" *Hickory Point Bank & Trust, FSB v. Kucera (In re Kucera)*, 373 B.R.

878, 885 (Bankr. C.D. Ill. 2007) (*quoting Beetler*, 368 B.R. at 730-31). *See also Wyss*, 355

B.R. at 136.

    In the matter at bar, there is no proof that Gail's forbearance lost any value or that it

cost her anything. Indeed, the testimony at trial indicated that at the time of the sale of the

McDonald's restaurants, had any of the proceeds been used to repay Gail's loan, the benefits

of § 1031 for the like-kind exchange of the McDonald's sale proceeds would have been lost.

If any proceeds were used to pay off creditors other than those of the restaurants, with the

balance reinvested in Joey Buona's, the Ojedas would have lost the tax deferral benefit of

§ 1031 and all sale proceeds would be subject to tax claims of the government ahead of

Gail's claim.

    Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud,

false pretenses, and a false representation. 11 U.S.C. § 523(a)(2)(A); *Bletnitsky v. Jairath
(In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001). A single test was applied to all

-19-

three grounds even though the elements for each exception vary under common law. *Jairath*, 259 B.R. at 314. The Seventh Circuit Court of Appeals made it clear, however, that misrepresentation and reliance thereon are not always required to establish actual fraud. *McClellan v. Cantrell*, 217 F.2d 890, 894 (7th Cir. 2000).

### 1. False pretenses or false representation

In order to except a debt from discharge due to false pretenses or a false representation under § 523(a)(2)(A), the creditor must establish the following elements: (1) the debtor made a false representation of fact (2) which the debtor (a) either knew to be false or made with reckless disregard for its truth and (b) made with an intent to deceive, and (3) the creditor justifiably relied on the false representation. *Baker Dev. Corp. v. Mulder (In re Mulder)*, 307 B.R. 637, 643 (Bankr. N.D. Ill. 2004); *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 710 (Bankr. N.D. Ill. 2004). To prevail on a § 523(a)(2)(A) complaint, all three elements must be established. *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001). Failure to establish any one factor is outcome determinative. *Jairath*, 259 B.R. at 314.

False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). The Court has defined false pretenses as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....

-20-

> A false pretense is usually, but not always, the product of
> multiple events, acts or representations undertaken by a
> debtor which purposely create a contrived and misleading
> understanding of a transaction that, in turn, wrongfully
> induces the creditor to extend credit to the debtor. A "false
> pretense" is established or fostered willfully, knowingly and
> by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (*quoting Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part, rev'd in part*, 146 B.R. 269 (D. Colo. 1992)). *Accord John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 872 (Bankr. N.D. Ill. 2004) (*quoting Paneras*).

False pretenses do not necessarily require overt misrepresentations. *Sarama*, 192 B.R. at 928. "Instead, omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* Silence or concealment may constitute false pretenses. *Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R. 570, 573 (Bankr. C.D. Ill. 2005); *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002).

A false representation can be shown through conduct and does not require a spoken or written statement. *Jairath*, 259 B.R. at 314. In other words, "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Health Benefit Plan v. Westfall (In re Westfall)*, 379 B.R. 798, 803 (Bankr. C.D. Ill. 2007). A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would

-21-

otherwise be a false impression. *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259,

263 (Bankr. N.D. Ill. 1992).

### 2. Actual fraud

The Seventh Circuit Court of Appeals defined the term "fraud" for purposes of §

523(a)(2)(A) as follows:

> 'Fraud is a generic term, which embraces all the multifarious
> means which human ingenuity can devise and which are
> resorted to by one individual to gain an advantage over
> another by false suggestions or by the suppression of truth.
> No definite and invariable rule can be laid down as a general
> proposition defining fraud, and it includes all surprise, trick,
> cunning, dissembling, and any unfair way by which another
> is cheated.'

*McClellan*, 217 F.3d at 893 (*quoting Stapleton v. Holt*, 250 P.2d 451, 453-54 (Okla. 1952)).

"Actual fraud" is not limited to misrepresentation, but may encompass "any deceit, artifice,

trick, or design involving direct and active operation of the mind, used to circumvent and

cheat another[.]" *Id.* (internal quotation omitted). Hence, a different analysis must be

utilized when a creditor alleges actual fraud. *Id.* The *McClellan* court opined that because

common law fraud does not always take the form of a misrepresentation, a creditor need not

allege misrepresentation and reliance thereon to state a cause of action for actual fraud under

§ 523(a)(2)(A). *Id.* Rather, the creditor must establish the following: (1) a fraud occurred;

(2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the

subject of the discharge dispute. *Id.* at 894. The fraud exception under § 523(a)(2)(A) does

not reach constructive frauds, only actual ones. *Id.* The existence of fraud may be inferred

if the totality of circumstances presents a picture of deceptive conduct by the debtor that

-22-

indicates he intended to deceive or cheat the creditor. *Cripe v. Mathis (In re Mathis)*, 360 B.R. 662, 666 (Bankr. C.D. Ill. 2006); *Sielschott*, 332 B.R. at 572.

### 3. Intent

Any cause of action under § 523(a)(2)(A)–false pretenses, false representation, or actual fraud– requires proof that the debtor acted with intent to deceive. *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). "Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made." *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315. Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances. *Kucera*, 373 B.R. at 884; *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1020 (Bankr. N.D. Ill. 1996). The determination of intent is a question of fact to be decided by the bankruptcy court. *Howard*, 339 B.R. at 919.

### 4. Justifiable Reliance

The final element under § 523(a)(2)(A) requires a finding of causation. Reliance on a false pretense, false representation, or actual fraud under § 523(a)(2)(A) must be "justifiable." *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance is a less demanding standard than reasonable reliance and requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 71 (internal

-23-

quotation omitted). Justifiable reliance is an intermediate level of reliance that falls somewhere between the more stringent "reasonable reliance" guidepost and the lenient "reliance in fact." *Id.* at 74-75.

The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent. *Id.* at 70-72. Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by an objective standard. *Id.* at 71; *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (*quoting Field v. Mans*, 516 U.S. at 70). "However, a 'plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods.'" *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (*quoting Zirkel v. Tomlinson (In re Tomlinson)*, Bankr. No. 96 B 27172, Adv. No. 96 A 1539, 1999 WL 294879, at *12 (Bankr. N.D. Ill. May 10, 1999)).

To satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge. *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir. 1995) ("Reliance means the conjunction of a material misrepresentation with causation in fact."). *See also Westfall*, 379 B.R. at 805 (*citing Mayer*).

-24-

## IV. DISCUSSION

The Ojedas' alleged wrongful conduct did not occur when they originally obtained the $600,000 loan.  Rather, Gail complains of the Ojedas' actions with respect to their subsequent failures and omissions to advise her of the Pan American Bank sale, the attendant reverse stock split of the Bancshares stock into Cermak stock, and the sale of the McDonald's restaurants and the reinvestment of some of those proceeds in Joey Buona's without repayment in full of the $600,000 principal amount.

When the Ojedas entered into the 2001 Note, they continued to pledge as security Ernest's 160,000 shares of Bancshares stock even though those shares no longer existed at that time, but rather, had been reduced to 1,600 shares of Cermak.  As a result of the sale of Pan American Bank to JD Financial, Ernest did not have an interest in Bancshares or Pan American Bank when the Ojedas signed the 2001 Note.  The 2001 Note specifically stated that payment "is secured by Borrower's pledge to Lender of 160,000 shares of Pan American Bank. . . ." (Gail Ex. B.)  The Court finds that at no time during the discussions leading to the execution of the 2001 Note, did the Ojedas inform Gail or Ronald that Pan American Bank had been sold, that Ernest was no longer chairman of the boards of Bancshares and Pan American Bank, that the name of Bancshares had been changed to Cermak, or that there was a reverse stock split that rendered the pledged stock shares virtually worthless.

The Court finds that the renewed pledge of the Bancshares stock by the Ojedas to Gail in 2001, after Pan American Bank had been sold, was a false and misleading representation.  Moreover, the Ojedas' failure to inform Gail of the sale, the reverse stock split, the name change to Cermak, and the fact that those shares were worthless constituted

-25-

an intentional misleading omission. The Court finds that the Ojedas' conduct in failing to disclose the diminished value of the pledged stock amounted to false pretenses and misrepresentation by omission. The Ojedas' continued pledge of Ernest's 160,000 shares of Bancshares stock after Pan American Bank had been sold and the shares became 1,600 shares in Cermak constituted a false and misleading representation of a material fact. These deliberate omissions regarding the value and material change in the Bancshares stock pledged as collateral constitute dishonest conduct that § 523(a)(2)(A) is designed to address.[11]

The strongest evidence in favor of the Ojedas is their timely payment of interest until January 2006. However, that fact, along with their complete failure to advise of the change in their financial situation, as they agreed to do in their personal financial statement, had the effect of lulling Gail into a false sense of security and an actual belief that the collateral for the promissory notes still existed and that it was as valuable as when the loan was originally made in 1998.

The Court further finds that the Ojedas' subsequent failure to inform Gail of the sale of the McDonald's restaurants in October of 2004 was materially misleading and designed to deceive Gail in order to obtain an extension of the past due date of repayment of the $600,000 principal indebtedness. The corporate guarantees of Pelham and Dices, Inc. were

---

[11] The record is not clear with respect to when the undated Second Note was executed. As a result, the Court cannot determine whether the sale of Pan American Bank occurred prior to the time the Ojedas signed the Second Note or whether Ernest still owned the 160,000 shares of Bancshares stock when the Second Note was executed. Accordingly, the Court will not make any findings that the Ojedas made misrepresentations in connection with their execution of the Second Note.

-26-

obtained based on the understanding that they were backed by the continued successful operations of the McDonald's restaurants. Although security interests in the underlying assets of Dices Enterprises and Pelham were requested, Ronald and Gail were told that the McDonald's franchise agreements prohibited same. Thus, Gail did not have any liens on the restaurant assets of Dices Enterprises or Pelham, and was not paid from the sale proceeds when the restaurants were sold. After the sale, the corporate guarantees were no longer backed by the McDonald's restaurants (although Dices, Inc.'s guarantee never was), and this fact was not disclosed to Gail until the Ojedas stopped paying interest on the loan in January of 2006.

The Court finds that the Ojedas were not under a contractual duty to inform Gail of the sale of the McDonald's restaurants. Hence, their failure to inform Gail of the sale of the restaurants, in and of itself, did not constitute a misrepresentation. However, the failure to inform her of the sale, along with their continued use of the Dices Enterprises checks that contained the McDonald's information, created a false impression that the Ojedas had a continued interest in the restaurants. These actions and omission on the part of the Ojedas constitute false pretenses for purposes of § 523(a)(2)(A).

Next, based on the evidence, the Court reasonably infers an intent to deceive on the part of the Ojedas because the facts portray a clear cut "picture of deceptive conduct" by them. *See Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005). First, the Court finds that the Ojedas knowingly misrepresented and misled Gail with respect to the value and status of Ernest's interest in the Bancshares stock for the purpose of deceiving Gail into not calling the loan and continuing to extend the time for

-27-

repayment of the $600,000 indebtedness. The Ojedas were aware in 2001 that Ernest did not

own 160,000 shares of Bancshares stock. Nevertheless, they signed the 2001 Note and made

the representation to Gail that Ernest continued to own that stock. The Court finds that the

Ojedas knowingly intended to deceive Gail of the true status of Pan American Bank,

Bancshares, and Ernest's stockholdings therein. The Ojedas' pledge of the Bancshares stock

in the 2001 Note when they knew that Ernest no longer owned 160,000 shares of that stock

demonstrates an intent to deceive Gail. Based on these actions, the Court can reasonably

infer an intent to deceive on the part of the Ojedas.

Second, the Court finds that the Ojedas' failure to inform Gail of the sale of the

McDonald's restaurants, and their subsequent decision to make payments to Gail, after the

sale of the McDonald's restaurants, solely with Dices Enterprises corporate checks, which

contained the McDonald's name and other information relating to the McDonald's

restaurant, establishes that the Ojedas intended to deceive Gail with respect to their lack of

any continued ownership of the restaurants. Further, the Court finds that after the sale of the

McDonald's restaurants, the Ojedas made payments to Gail only with Dices Enterprises

checks because they intended to deceive Gail into believing that they still owned the

McDonald's restaurants. Ernest testified he knew that the McDonald's restaurants were an

important factor when Ronald and Gail were considering whether to make the loan. The

Court finds that the Ojedas' failure to inform Gail of the sale of the restaurants, which

resulted in Pelham, the one guarantor on the loan who owned one of the restaurants, no

longer having an interest therein, along with the deceptive conduct with respect to the use

of the Dices Enterprises checks to pay Gail, was misleading and lulled Gail into a false sense

-28-

of security which therefrom she did not demand immediate repayment of the $600,000 principal indebtedness.

The Court finds Beverly's testimony that she did not think it was necessary to remove the franchise number and restaurant address from the Dices Enterprises check stock incredible. Beverly was an astute and experienced businesswoman who should have known that any reference to the formally owned McDonald's restaurant on the Dices Enterprises check stock would create the false impression that Dices Enterprises continued to own and operate the restaurant. In addition, Beverly's testimony that her accountant told her to remove only the McDonald's logo does not obviate the false impression that Dices Enterprises continued to own and operate the restaurant.

Ernest testified that he did not intend to deceive Ronald and Gail with the use of the Dices Enterprises checks. Rather, according to Ernest, he and Beverly were simply utilizing the existing check stock which had the McDonald's information on it. However, when questioned why new Dices Enterprises checks were ordered with the franchise number and address of the restaurant after the sale in October of 2004, Ernest could not explain the rationale behind this action other than to say that the accountant told him to keep the Dices Enterprises account open.

The Court finds that the continued reference to the McDonald's restaurant on the Dices Enterprises checks was an intentional, deceitful act on the part of the Ojedas fostered to create the impression that Dices Enterprises continued to own and operate the restaurant. The Ojedas' payment of interest to Gail strictly with the Dices Enterprises checks and not with the Pelham checks demonstrates their intent to mislead Gail to believe that Dices

-29-

Enterprises continued to own the McDonald's restaurant. Indeed, Gail testified that she drew this very conclusion.

Next, the Court must determine whether Gail has met the justifiable reliance element of proof required under § 523(a)(2)(A). Gail argues that she relied on the Ojedas' original financial statement, their continued interest payments through January of 2006, and their failure to reveal timely the sales of Pan American Bank and the McDonald's restaurants, which induced her to forbear in demanding repayment of the unpaid principal, interest, fees and costs. Gail's reliance causally related to the above described facts, but was not justifiable for the following reasons.

Looking at the qualities and characteristics of this particular plaintiff, and all the facts and circumstances of this particular matter, the Court concludes that Gail has not demonstrated that her actions constituted justifiable reliance. Indeed, she did little if anything in the entire history of the debtor-creditor relationship other than to take a few phone messages from Ernest for Ronald. Gail testified that she did not conduct any independent inquiry into the facts and circumstances surrounding the loan and the extensions. Rather, she testified that she relied solely on Ronald to handle all aspects of the loan to the Ojedas. The question then becomes whether Ronald, as Gail's husband and apparent agent, acted with justifiable reliance which can then be imputed to Gail. Absent that, Gail has not demonstrated justifiable reliance for purposes of the statutory requirement.

Ronald testified that he did not possess a college degree. However, he stated that he spent twenty-seven years as a deputy sheriff in Cook County, Illinois, and he was a police officer for the Village of Stone Park. Ronald also declared that he was in the wireless

-30-

communications business for thirty-five years and that he operates a wireless communications company that, at its height, grossed millions of dollars. Ronald also testified that since the 1990s he has acted as a venture capitalist and has made at least 25-30 other high-risk loans, charging high rates of interest, like the loan he made to the Ojedas. Hence, he is no novice at making substantial unconventional loans.

The Court finds that based on Ronald's sophistication as a successful businessman in the wireless communications area, as well as his experience making high-risk loans, he should have made some further inquiry when he learned that Pan American Bank's operations and value were questionable in December of 1999. Ronald obtained the guarantees of Dices, Inc. and Pelham as additional collateral for the loan extension, but he did not request any current financial data from these companies. In fact, as previously discussed, Dices, Inc. operated as a management company and did not own any substantial assets. Hence, the guarantee from Dices, Inc. was virtually worthless. Moreover, the financial statements furnished at the outset of the transaction were from Pelham and Dices Enterprises, not Dices, Inc. (Gail Exs. H & I.) Thus, Ronald took a corporate guarantee from a company with no substantial assets and with no supporting financial documentation.

Ronald testified that during the Ojedas' approximate eight year loan period he did not ask for updated financial information on the McDonald's restaurants, nor did he request updated financial information from Dices, Inc., Dices Enterprises, Pelham, or the Ojedas. Ronald admitted that reasonable diligence in the lending industry includes obtaining periodic updated financial statements. He further conceded that procuring such updated financial statements would constitute good business practice. Ronald stated that he did not request any

-31-

updated financial information because the Ojedas made all of the interest payments in a timely fashion.

This matter is not like the situation where the lenders and borrowers are close friends, and as a result, the borrowers use their close relationship with the lenders to induce them to make the loan extensions, make false representations to the lenders who, as close friends, take those representations as true, and then fail to make any further inquiry because of their relationship with the borrowers. *See Daly v. Braizblot (In re Braizblot)*, 194 B.R. 14, 21 (Bankr. E.D.N.Y. 1996). In *Braizblot*, the court found that the lenders had justifiably relied on the borrowers' representations because of the nature of their relationship. *Id.* Here, the Ojedas and Ronald and Gail were introduced by a neighbor of Ronald and Gail. The couples did not have a close relationship that would have justified Ronald and Gail's reliance on the representations made by the Ojedas. In other words, this matter is not akin to the situation where Gail "relied upon the honesty of . . . old friend[s] who took advantage of [her]." *Loomas v. Evans (In re Evans)*, 181 B.R. 508, 514 (Bankr. S.D. Cal. 1995).

The Court finds that Ronald was aware in December of 1999 that the Bancshares stock was not worth the $800,000 he had originally thought it was worth. Ronald did seek the additional corporate guarantees from Dices, Inc. and Pelham, but after that, he did not request or obtain any further updated financial information. Ronald's awareness of Pan American Bank's problems was a red flag that should have invited more inquiry by him. Instead, he relied blindly on the Ojedas' continued payment of interest. His limited actions are simply too ostrich-like to constitute justifiable reliance to satisfy that element required by § 523(a)(2)(A). "[A] creditor may not close [his] eyes to red flags that demand inquiry

-32-

into the truth of a debtor's assertion." *Taylor v. Sykes*, No. 05 C 3717, 2005 WL 3542520, at *3 (N.D. Ill. Dec. 22, 2005).

The Court finds that a creditor's sole reliance on continued interest payments made by a debtor on a matured promissory note is not enough to constitute justifiable reliance. In light of the unconventional nature of this high risk loan of $600,000; its supposed short-term "bridge" status; the inability of the Ojedas to obtain another takeout lender over the years; and the long past maturity date of the last renewal note, Gail's failure to request an updated financial statement from the Ojedas and the corporate guarantors points to a lack of justifiable reliance, which offsets the apparent sole reliance by her on the continued payment of interest until January of 2006 when payment stopped and the true financial situations of the Ojedas and the corporate guarantors were revealed.

In sum, the Court finds that Gail failed to establish justifiable reliance. As a result, the Ojedas' debt to Gail is dischargeable and does not fall within the § 523(a)(2)(A) exception to discharge.

## V. CONCLUSION

For the foregoing reasons, the Court finds that the debt owed by the Ojedas to Gail is dischargeable.

-33-

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

ENTERED:

DATE: _4/22/8_

_John H. Squires_
John H. Squires
United States Bankruptcy Judge

cc:  See attached Service List

## SERVICE LIST

### Gail Goldberg v. Ernest J. Ojeda and Beverly V. Ojeda
**Adversary Case No. 07 A 00192**

Stuart Gimbel, Esq.
Joseph L. Matz, Esq.
Alon Stein, Esq.
Kamensky Rubinstein Hochman & Delott, LLP
7250 N. Cicero Avenue, Suite 200
Lincolnwood, IL 60712

Paul M. Bauch, Esq.
Carolina Y. Sales, Esq.
Kenneth A. Michaels, Jr., Esq.
Bauch & Michaels, LLC
53 W. Jackson Blvd., Suite 1115
Chicago, IL 60604

Joseph A. Baldi, Esq.
Joseph Baldi & Associates
19 S. LaSalle Street, Suite 1500
Chicago, IL 60603

William T. Neary, United States Trustee
227 W. Monroe Street
Suite 3350
Chicago, IL 60606